Case number 24-5649, Holly Lawson v. Kayla Creely et al. Oral argument, 15 minutes per plaintiff, 15 minutes to be shared by defendants. Mr. Wiest for the appellant. Good morning, Your Honors, and may it please the Court, my name is Chris Wiest. I represent the plaintiff, Holly Lawson. I request six minutes for rebuttal. Yes, sir. Your Honors, this is an appeal of a summary judgment order entered in favor of the defendants in a 1983 case involving a warrantless search of the plaintiff's purse by defendants Creely and Franke, who were school guidance counselors and a registrar who worked with her. And that search ultimately revealed a handgun that was reported to law enforcement by another co-worker that they had shared that with. And then the very next day was followed by a custodial detention and questioning of the plaintiff that we contend violates the Fourth and Fifth Amendments. If it pleases the Court this morning, I wanted to address the following issues. And I know there are other issues in the case, and I'm happy to address any of the issues. But I intended to address, one, that Ms. Creely and Ms. Franke were state actors when they engaged in this purse search. Two, that they violated clearly established law when they engaged in the purse search, the warrantless purse search. Three, that they undertook that search pursuant to board policy. And four, that the actions the next day involving the custodial detention in violation of Miranda and Garrity, that there was a custodial detention. And then fifth, that that also violated clearly established law as far as the superintendent is concerned. Beginning with the state action question, Your Honor, there is no question here but that these individuals searched the purse on school time, on the clock, only were able to access the location. My client, and there is an issue of fact on this, we don't think it's genuine, entered a locked office. The defendants clearly and frankly say that it wasn't locked. My client says it was locked. There's an issue of fact there. We don't think it's genuine because it is a private office. They enter the office, they walk around, and then they begin removing items out of her purse where they discover the handle of a handgun. They were only able to even be in that office pursuant to their responsibilities for the board. And then we get into the fact that there's two board policies that I think are at issue throughout all of this case. It was Exhibits 11 and 12 in our depositions, Page IDs 576 and 577. 576 was the classified personnel policy which would have been applicable to Ms. Frankie. 577, Exhibit 12, is the certified policy. And it's a wide-ranging policy that says all employees are expected to use sound judgment in the performance of their duties and take reasonable measures to protect the health, safety, and well-being of others as well as district property. And when we questioned Creeley and Frankie, they said, I don't know if it was pursuant to policy or not. We asked the same question of the 30B-6 witnesses. They said, you know, we can't tell you and we didn't give anybody any training on it and there was a lot of discretion under that policy. Why rely on a policy that broad? It seems like that would make all the employees of the school district state actors. Like if a janitor went in there and did the same thing, it seems like you would take the position that based on that particular policy that they were state actors. And I think, you know, what the cases say is just because you're a public employee doesn't mean that you're a state actor based on what you're doing. It depends, Your Honor. I think being a state employee on the clock, on the job, being paid, I think only able to do this because you're vested with state authority. And to your point, I think if a janitor had done the same thing and the board had given them the discretion to do so under these policies, I think they are state actors. Who the board decides to delegate this broad authority to is up to the board. But when you look at this court's case in Montessori, the Montessori case, where this court said, hey, listen, in that case there was a detective. We gave him wide-ranging discretion and because of that, that wide-ranging discretion, he was actually not only a state actor but the ultimate state actor for purposes of Monell liability in Montessori. The same is true here. When we look at, and the board didn't have to give, they could have cabined that discretion under Exhibits 11 and 12 under these board policies, but they didn't. And so they conferred on every employee the ability to take reasonable measures to protect health, safety, and well-being of others. And by so doing, to your point, Your Honor, yeah, it could be a janitor. And if the school wanted to avoid that, well, the school should have cabined what their employees could do under this policy, the discretion that they were giving them. But they instead chose, just like in Montessori, to delegate it. And so that becomes a problem for the board, both under state action and frankly under the Monell issue with respect to the purse search. Because as far as we're concerned, this was discretionary just like Montessori. And because of that, and because of that wide-ranging discretion, they've got a Monell problem and they've got a state action problem. When you bring up the purse search, explain to me what that search seemed like. You know, I saw the video, and I'm sure that there's some discussion before the video turns on. But a cop says, you know, I need to know if this is true. And the plaintiff reaches in to her purse and says, yeah, you know, there's a gun in there. How is that a search by a cop or whoever? So Your Honor, there's two issues that goes on with the search. There's a search by Creeley and Frankie the day before, where they go into the office, they invade the office, and they rifle through the purse. That's a search. The problem the next day is we've got an in-custody detention and questioning. And when we start to look, for instance, at the Royer case, the U.S. Supreme Court case in Royer, that's a problem. And so... Can you explain to me, tell me where in the complaint you allege a Fifth Amendment sort of violation as part of your 1983? It seemed to me that it was a Fourth Amendment issue. It's both, Your Honor. So it's a Fourth Amendment because of the seizure, but it's also, we do cite in the complaint, Miranda and Garrity. That plainly puts them on notice of, those are Fifth Amendment issues, of that. And obviously it was fully briefed in summary judgment. The complaint indicates Miranda and Garrity. It cites the Miranda and Garrity. So I think it's been raised. I mean, and it's notice pleading. And so they're on notice that there's a Miranda and a Garrity issue, and that only arises under the Fifth Amendment. And I want to talk about what happens the next day, because I think that that's important too. They could have met her at the door. They could have met her at the door with law enforcement and conducted an appropriate Terry stop that says, hey, we had a report yesterday. You've got a gun. Do you? That would have been a Terry stop as the district court analyzed it, and that would have been acceptable under the Fourth Amendment. That's not what they chose to do. They had a plan of action, and I want to talk about what they did and what they chose to do. Superintendent Copp, and this is mostly on video, we don't have audio of the escort, but he meets her at the door, and he escorts her not into a large conference room, but into a confined school resource, a law enforcement office. There's a sheriff's shield on the door. There are two armed law enforcement officers present wearing uniforms and badges and guns. They escort her in. They close the door. They block her, and the positioning of them, and this was consistent with the testimony is, the superintendent who admits, I'm a pretty big guy, and I was standing in front of the door. That's his testimony. And then you've got Abrams, the security coordinator with the sheriff's department, who was in fact a sworn law enforcement officer. He was sitting behind also, and his testimony was, yeah, I was there to intercept her. So she's not free to leave. And what do they do? The very first thing they do is they start a camera recording to interrogate her. You remember that? That is in custody, and that's in custody, it's almost on all fours with what the U.S. Supreme Court, Royer. Royer talks about how, and that was a drug case at an airport that begins in a public area in a baggage carousel, and then the individual is escorted into, as the U.S. Supreme Court indicates it, a small room. It's described as a large closet equipped with a desk and two chairs, just like the school resource officer office here. Let me just interrupt one second and start with the, I guess the, when Ms. Lawson first enters the building and she's escorted to this resource officer's office, I mean, why isn't it reasonable for the superintendent and the officers to say, hey, look, you know, we have concerns that this guidance counselor has a gun, you know, this is more of an open area, there are a number of people who might be exposed to whatever happens, you know, we're going to just take a brief walk to a more secure location and ask her whether she has a gun. What's, I guess I'm just wondering what's not reasonable about that. I think the problem with that, Your Honor, and again, we can get into the factors that this court looks at for in custody and in detention, is that I think had it been a school conference room, in other words, a large conference room where her door isn't blocked, I think that could have alleviated the concern. I think they could have said to her at the very beginning, hey, listen, you're free to leave and we're not blocking your ability to leave. I think that could have alleviated the concern. What they can't do is block her egress, not tell her she's free to leave, not tell her she can't answer questions or that she's free not to answer questions, to begin an interrogation after they start recording. And by the way, the testimony of the school resource officer was, the reason that they took her to that office, was they wanted to display a show of force. That was the plan going in. And so when you've got this plan, as opposed to, I don't know, you could have met her at her house, you could have called her on the phone if you had a concern, you could have met her at the door with the law enforcement officers and conducted what's, you know, a typical Terry stop and said, hey, we've got this report, do you have it? But no, they bring her in and there, Your Honor, is this entire line of cases that I think it's the Hinosa case from this court that talks about factors that we look at, when we... That's a good enough answer. I know your time is expiring. I'll leave that to the Chief here to handle that, but you have your full rebuttal time. Thank you, Your Honor. Mr. Weiss. Your Honors, my name is Elizabeth Diener. I represent the Appalese, Ms. Creegly and Ms. Franke. We believe that the Eastern District of Kentucky was correct in dismissing the case against these Appalese, but we believe that the incorrect decision was made in that they did not perform as state actors, they were not acting under color of state law, and they did not violate Ms. Holly Lawson's Fourth Amendment rights. To go to the question that Judge Mathis asked of why rely on a policy so broad, the policies cited by the appellant do not convey carte blanche on school employees. They do not require or permit school employees to search or to act as agents of law enforcement or even agents of the Board of Education in snooping on their colleagues. The Board of Education, in their brief, goes into great detail in this. We discussed it in our motions for summary judgment practice in the record below. In a case that is cited in the motion for summary judgment, Marson v. Thomason, a Kentucky Supreme Court case, the Kentucky Supreme Court approached that issue from the opposite direction. In Marson, a teacher testified... Where do we draw the line? What I'm hearing from the plaintiff is essentially based on the policy that we're talking about, all employees are expected to use sound judgment, everyone is a state actor, based on their argument. Where do we draw the line based on that policy, other policies, as to when your clients are engaged in state action as opposed to private action? I think the United States Supreme Court, even most recently in Linkey, made that decision. The Eastern District, an appellant, is asking this court to make the math of state employee equals state actor. Second equation, state actor equals acting under color of state law, therefore 1983 violation. Therefore, state employee equals acting under color of state law. The Supreme Court has set out a very clear nexus test that says to be acting under color of state law, the state employee has to be performing a specific function of their job. Going through Ms. Lawson's purse is not a function of guidance counselor. It's not a function of a classified secretary in the school. It is completely outside, and an appellant has argued in his briefing that Doe versus Claiborne County, which is not an individual action case, that's a policy case, but argued cases where employees have exerted influence or coercion over students or coworkers as a function of their job. This is not a function of being a guidance counselor. This is a private action, and state employees are allowed to be private actors even when they are on state time. I believe that that's also stated very clearly in the Fortney, a private party performing a search for private reasons, however wrong or right or wrong, when it's not a search at the behest of the police or to collect evidence for a criminal investigation. The evidence is very clear in this case. The record is clear. They were not instructed to snoop. They were not instructed to do a search. Law enforcement was not involved. They didn't tell law enforcement. They didn't tell the superintendent. They didn't tell the principal. Not only was this not a function of their jobs as guidance counselor and secretary, and I believe that Ms. Franke's description of her job was be a welcoming face to students coming to the guidance suite. That cannot be interpreted in any way of reporting, spying on, and reporting on colleagues. But you can, when you say private reasons, I mean, I kind of think of private reasons as you've got two co-workers who, they're just curious. I think a co-worker is drinking and has a bottle of alcohol in the purse, or what kind of medicine is she taking. Here, they said that they were concerned about the students because Ms. Lawson had been a student and I can't remember the, slurring her words and acting, her behavior was out of the ordinary. So it wasn't just snooping for like sort of private purposes. They were concerned about the welfare of the students. So is this sort of in kind of a gray area, as opposed to, it's just not the sort of snooping that two nosy co-workers would do just out of curiosity. No I don't, with respect Judge, I don't see a distinction in your question. Because if somebody is snooping, you said snooping for curiosity, what medication someone is on. That is what they were doing. And there's usually some motivation. If you're worried about a neighbor who you think is being, walking unsteadily down the sidewalk or slurring their words in conversation with you and they leave their bag on their front lawn and you're going, I don't know, she's getting ready to go on a road trip. Should I check and see if she's been drinking? Well, there's not much difference there. Yeah, but you do have this very, it is a very broad policy. But, you know, the concern is over, you know, how that guidance counselor's behavior, she's in the school, might impact the well-being, safety, health of the students. It's not quite the same as a neighbor who's about to go on a road trip, I would think. I appreciate your question, your honor. I still don't believe it meets the nexus test. I believe that the law of the commonwealth is clear that that is not a carte blanche to do this and it is not part, and the superintendent testified that it is not part of the duties of these two employees. Now, assuming that, you know, we believe it is state action, you would agree that there's a fourth amendment violation here. Is that right? The search, if they're engaged in state action, the search was improper, correct? I believe that there was not a search to begin, I mean, a search under the fourth amendment to begin with. The appellant's arguments start as very circular, they start from the assumption of it is a fourth amendment violation per se, no questions asked, and therefore you must prove exceptions. In their favor, how is it not a search? They go into an open, I mean, a closed room and open a purse that's latched in some way. How is that not a search? Well, the purse is not latched, and the photographs of the purse are in the record at page ID 166, and the following pages it shows a Neverfull is a tote bag that cannot be closed. It is impossible, factually and physically impossible to close that bag. However, a fourth amendment violation requires some injury to result from it, and no injury resulted from their action. And this is in part why we made the proximate cause argument, because the snooping was on May 4. They didn't report it to anyone. As far as, their snooping exists in a vacuum. They didn't call law enforcement, and they were required to, and they were sanctioned for it. So they told Reed, told the SRO, SRO tells Cobb the next day everything happens. Yes, and in that intervening time, Ms. Lawson takes her bag, leaves the school with it, goes home, spends the night, and comes back with it the next day, which we believe breaks any proximate cause and certainly acts as an intervening act on the part of the appellant with regards to any search of the bag. Therefore, there's no connection between any potential fourth amendment violation on May 4, and her arrest for possessing a loaded firearm in school on May 5. And I'm out of time. If you have any more questions, I'll answer them. Good morning, your honors. Grant Chenoweth on behalf of the Board of Education of Franklin County and Superintendent Mark Cobb. There are a couple of overarching issues that I would like to just not let them get lost in, whatever questions you may have for me. One is that cross motions for summary judgment do not demand that summary judgment be granted for one or the other party. So the plaintiffs requested relief that summary judgment that was granted be reversed and that she be granted affirmative summary judgment. None of her brief goes toward that. None of the brief shows that she was entitled to summary judgment. She doesn't present any of the facts from a point of view of taking the facts in the light most favorable to the defendants that she would be entitled to summary judgment. So even if it's reversed, I believe it should be just reversed back to the trial court, not with a order to grant summary judgment in her favor. Additionally, the relief, she asked this court to order reinstatement. The district court never reached the issue of relief. That's a question for the district court in the first instance. So reinstatement also is not an absolute right, even if she prevails at the door between reinstatement and front pay. So the relief that she's demanding has not been explored at all by the trial court because of summary judgment being granted. We did preserve and do argue that even if this court determines, contrary to the district court, that Mr. Copp did violate her rights, that he is still entitled to qualified immunity. There's not a single case that is referenced by Ms. Lawson in her brief that relates to a... Is this just a Fourth Amendment issue or a Fourth and Fifth Amendment issue? How are we looking at this? After you asked the question of Mr. Wiest, I pulled the complaint up. Miranda and Garrity are not cited in the complaint. It's nine pages long, give or take. There is a reference to detention somewhere within the recitation of facts, but it sets out a single claim and the Fourth Amendment is referenced in seven or eight paragraphs. Fifth Amendment is not referenced at all. Miranda and Garrity are not referenced at all. Even if it was pleaded as a Fifth Amendment case, the case law that I cited in our response brief is that in the absence of coerced statements being used for criminal prosecution, the right to have a standalone right. It's a right that if it is not fulfilled, then it prevents certain evidence or statements from being used at a criminal trial, but it doesn't just stand alone as a right to not be questioned without having Miranda warnings issued. There was no point... Your honors have the video. I think you've referenced it. There's no point where she is told, you have to answer this question or else you will lose your job if you remain silent, so she wasn't compelled to speak at risk of losing her job, so Garrity doesn't apply. The facts don't line up at all for Garrity, but there was never a criminal prosecution, so the Fifth Amendment right to not have coerced statements used against you doesn't arise under the facts of this case. I think it's important, again, not to lose track of. Mr. Weiss does focus significantly on the policy language of those two policies. Those are two pages out of about a thousand-page policy manual that covers lots and lots and lots of different topics, and those are just the precatory first sentence of a duties policy that then goes on and says, perform your duties. You have an immediate supervisor. You have a job description, so it's within the scope of the things that are assigned to you. This is the mindset, safety, security, reasonable measures, but it's not grant yourself additional duties, assign yourself additional duties. Unequivocally, that same policy for both certified and classified employees says that they are to cooperate in any investigations that are authorized by law or policy. Nowhere in that duties policy does it just say the rank and file employees can initiate an investigation at will. The other policy that is cited in our briefs is the safety policy that essentially says any employees that see a safety concern, tell your supervisor, and then your supervisor will examine that and determine appropriate action. That policy also tells the rank and file employees, it's not your job to investigate the safety concern. It's your job to report the safety concern. They didn't do that. Whatever their concern was that motivated them that morning to go into Ms. Lawson, or that afternoon to go into Ms. Lawson's office, they didn't report a safety concern to their immediate supervisor or Ms. Lawson's supervisor. They took it upon themselves to snoop, and there's no policy language that would tell a guidance counselor or a registrar that any aspect of their job authorizes them to investigate a co-worker's potential misconduct or concerning behavior or whatever the case may be, whatever they perceived. So the employee handbook directs employees to use reasonable measures and exercise sound judgment in connection with student safety. Does the record reflect that the school system has any sort of training for employees in terms of how to actually conduct themselves with these very broad principles? I will say that there is not training that would specifically address that phrase, that sentence as to how to determine reasonableness, but I will say that's true of every negligence case that we've ever heard. It's the reasonable person standard, and there is not a training manual on how to behave like a reasonable person. So an employer instructing all of their employees to behave like a reasonable person and keep the safety of students forefront in your mind is not the same thing as granting them discretion to just do anything they can think of that somehow relates to safety in the building. As I recall, either one or both of them said, maybe in a deposition, that they weren't so sure what policy they were acting under and what the scope of their authority was. So just wondering in terms of this failure to train argument, what sort of training is reflected in the record? And it sounds like you've answered the question. Yes, Your Honor. And for Monell purposes, they weren't aware of that sentence in the policy. They weren't acting because they thought a certain policy granted them authority to do something. And even if this court does conclude that it's state action and that it's under color of state law, that does not retroactively mean they thought they were doing what their employer wanted them to do based on a policy they had never read. So I don't think either of the prongs to get Monell liability for Ms. Creeley and Ms. Franke's actions can make it to the board under that policy argument. Anything else? Thank you, Your Honors. I appreciate it. Your Honor, briefly in rebuttal, and I want to refer specifically to the record because some of the statements that were just made are actually contrary to the record evidence and testimony below. The testimony of Ms. Creeley and Ms. Franke was the reason they did this was, quote, concern for the students that she was working with, that Ms. Lawson was working with. That's at Ms. Creeley's deposition at document 38 at page 48, page ID 728. Ms. Franke articulated similar testimony at pages 32, 33, and 36 of her deposition, page ID 863, 864, and 867. And then I get into the board testimony about this policy and the failure to train. The board 30B6 deponent on this policy indicated that what is reasonable under Exhibits 11 and 12, in terms of reasonable measures, is left to the discretion of the employee. And that is at doc 36, pages 24, 25, also 166, 169, 86, and 87 of that deposition. It's page IDs 373, 374, 435, 36, and 38. And when we specifically asked the board, hey, do these policies authorize the search of a purse? Do they? The response was, I don't know. And that's at 25, 86, and 87 of the same deposition, page IDs 374, 435, and 436. So this notion that somehow this is some frolic well outside the scope of employment, when the board's witnesses say, I can't tell you what it might have been, is frankly disingenuous. I want to get to proximate cause. Proximate cause is a matter of foreseeability. And there is nothing that would indicate, one, that the defendants even knew that Ms. Lawson knew about the firearm. Two, we know for sure that she didn't when we look at the video interaction. And she is frankly shocked that it's there because she had forgotten about it. So there's nothing that would reasonably break the chain of causation. And generally, as a matter, as the court is aware, proximate cause is generally an issue of fact, not an issue of law. That's for a jury to decide whether or not proximate cause is met or not. Whether or not the purse was closed or locked is an issue of fact. Ms. Lawson testified that it was. And there's no evidence to the contrary. I recognize Creeley and Franklin said it was open. I don't think it matters. I don't think it's a material fact. I do want to mention, Your Honors, I indicated we cited Miranda and Garrity. The actual allegations in the complaint, this is a paragraph 23 of our complaint, it's a DOC 1 page ID 5, was that she was in custody and she was questioned without a rights advisement. That was the allegation. It's a paragraph 23 of the complaint. So the disingenuous argument that we didn't raise it is contrary to the plain language of the complaint. And I wanted to finish, finally, with the testimony that the board gave about training. Because not only didn't they train, the testimony was, or the testimony that they did not know whether there was training, the testimony was they didn't provide training on this policy. They granted, as a Montessori, unfettered discretion to employees, certified and classified, to conduct reasonable measures, which every single witness said they're not sure if it was pursuant to it or not. And the board's testimony was, yep, we granted this discretion but we did not provide any training on either the handbook or the policies in that regard. And that's a DOC 36 in the 30B6 deposition, 168 to 169, page ID 517 to 518. So that's the testimony. And the testimony is contrary to everything that the defendants just got up here and argued. So is the evidence. This was, one, an unlawful search by Creeley and Franke taken, and I don't think it matters whether they know what the board policy is. They were concerned about student safety so they went and they did it. We do not let law enforcement officers off the hook in 1983 cases, nor do we allow cities off the hook in 1983 cases, dependent on whether or not the individual officer knows about the policy of the city. But it has to be clearly delegated. We know with police officers that authorities clearly delegate it. Plainly, your honor. But that's not the case here with these two individuals. We disagree. I mean, when you look at exhibits 11 and 12, these are duties. And all employees are expected to use sound judgment in the performance of their duties and take reasonable measures to protect the health, safety, and well-being of others as well as district property. And they provide no training on that. And so the prospect that there wasn't authority here to do what they did is contrary to these policies. I mean, I'm focusing, there's other policies too that we cite in the briefing, but I'm really focusing on 11 and 12 in the handbook that reflects the same thing. And so there is this delegation. Frankly, as the 30B6 witness testified, it's left to the discretion of the employee. And so the notion that there's not unfettered discretion here or an unfettered delegation I think is contrary to the record, testimony, and evidence in this case. Your honor, if there's no other questions, I'm happy to sit down. Thank you, counsel. Thank you. The case is submitted.